FILED ___ LODGED
___ RECEIVED ___ COPY

FEB 6 2001

CLERK U S DISTRICT COURT
DISTRICT OF ARIZONA
BY_____ DEPUTY

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| MICHELLE FOSTER and ROBERT FOSTER, d/b/a B&D PAINTING,<br><br>        Plaintiff,<br><br>vs.<br><br>MIJON III, L.L.C., a Missouri limited liability company, et al.,<br><br>        Defendant. | No. CIV 97-2544-PHX-EHC<br><br>**ORDER** |

   Plaintiffs Michelle and Robert Foster filed this action in Maricopa County Superior Court on September 12, 1997, and Defendants removed it on December 10, 1997. Plaintiffs allege that Defendants terminated them in violation of Title VII, 42 U.S.C. § 2000e et seq., in retaliation for Michelle Foster's complaints of sexual harassment. Plaintiffs further allege several related state claims.

   Robert Foster owns B&D Painting ("B&D"), a sole proprietorship, and his spouse, Michelle Foster, works with him in the business. Defendant Mijon III, L.L.C. ("Mijon") owns the Twin Palms Hotel, and hired Defendant High Plains Management Company ("High Plains") to manage the Hotel. Defendant Detlef Sarbok was the president of High Plains. In 1996, Mijon hired B&D to paint the Hotel. Plaintiffs allege that, in February, 1997, Defendants terminated the contract with B&D in retaliation for Michelle Foster's complaint about sexual harassment by the employees of a drywall company working at the Hotel.

By order issued May 10, 1999, the Court limited initial discovery to the issue of whether an employment relationship existed between Plaintiffs and Defendants. Pending before the Court is Defendants' motion for summary judgment on the ground that Plaintiffs were not Defendants' employees, and Defendants' motion to strike Plaintiffs' evidence submitted in opposition to summary judgment. Defendants requested a hearing on both motions, but a hearing is unnecessary because the parties provided the Court with complete memoranda discussing the law and evidence in support of their respective positions.

## Discussion

### I. Motion to Strike

Defendants move to strike evidence Plaintiffs submitted with their response to the summary judgment motion.

#### A. Barber and Harmon-Barber Affidavits

Defendants challenge the admissibility of affidavits prepared by Kerry Barber and Michelle Harmon-Barber, former employees of Mijon. Michelle Harmon-Barber averred that she was hired by Mijon and worked as the general manager for the Hotel while B&D painted there. (M. Harmon-Barber Aff. at ¶ 1, Pls.' Ex. D). Both she and Kerry Barber further aver that Kerry was the Maintenance Engineer for the Hotel while B&D painted there. (Id. at ¶ 3; K. Barber Aff at ¶ 1, Pls.' Ex. E). Both further aver that Kerry Barber checked the work of B&D on a daily basis.

Defendants argue that the affidavits are inadmissible because they were obtained via Plaintiffs' counsel's ex parte communication with Barber and Harmon-Barber, in violation of Ethical Rule ("ER") 4.2 of the Arizona Rules of Professional Conduct, which provides:

> In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.

A comment following ER 4.2 sets forth the limits on communication with employees of represented organizations:

> In the case of an organization, this rule prohibits communications by a lawyer for one party concerning the matter in representation with persons having a managerial responsibility on behalf of the organization, and with any other person whose act or omission in connection with that matter may be imputed to the organization for purposes of civil or criminal liability or whose statement may constitute an admission on the part of the organization.

The second category, that of "any other person whose act or omission in connection with th[e] matter may be imputed to the organization for purposes of civil or criminal liability," encompasses former employees in limited circumstances. Lang v. Superior Court, 826 P.2d 1228, 1231, 1233 (Ariz. Ct. App. 1992). Ex parte communication with a former employee of an opposing party is not prohibited "unless the acts or omissions of the former employee gave rise to the underlying litigation or the former employee has an ongoing relationship with the former employer in connection with the litigation." Id. at 1233.

Defendants argue that Barber's and Harmon-Barber's acts gave rise to the litigation because Plaintiffs introduce evidence of Barber's conduct in an attempt to establish the existence of an employment relationship. The underlying litigation involves claims arising out of Defendants termination of B&D's painting services. Plaintiffs do not allege that either Barber or Harmon-Barber were involved in the termination; therefore, their acts or omissions did not "g[i]ve rise to the underlying litigation." Id. Evidence of Barber's purported conduct is offered only with respect to the threshold issue of whether Title VII covered Plaintiffs in this action. The ex parte communication was not a violation of ER 4.2; therefore, the affidavits of Barber and Harmon-Barber are admissible.

**B.    The Fosters' Affidavits**

Defendants also move to strike portions of paragraphs two and five of both Robert Foster's and Michelle Foster's affidavits, on the ground that they contain inadmissible "hearsay regarding alleged instructions and other statements by Kerry Barber and Michelle Harmon-Barber." (Mot. to Strike at 2-3). Paragraph two of the affidavits merely states that Kerry Barber, a Mijon employee, supervised and instructed the B&D painters. It contains no purported hearsay statements by either Barber or Harmon-Barber. See Fed. R. Evid. 801(c), 802. The information in paragraph two will be considered.

In paragraph five of each affidavit, the Fosters aver that Barber and Harmon-Barber both stated that B&D would be working at the Hotel for about one year to complete the painting job. (Pls.' Exs. A, B at ¶ 5). Plaintiffs do not respond to the request to strike this portion of the paragraph as hearsay, but they argue that other statements of Barber and Harmon-Barber recounted in Plaintiffs' affidavits constituted party admissions. See Fed. R. Evid. 801(d)(2). The statements about the duration of the painting work are those of "agents or servants," Barber and Harmon-Barber, made during the existence of the employment relationship, but Plaintiff has not established that the statements "concerned a matter within the scope of [Barber's or Harmon-Barber's] agency or employment." Id. Therefore, the statements are not non-hearsay party admissions. Id. To avoid striking portions of affidavits admissible in part, the Court will treat Defendants' motion as a motion to exclude the evidence from consideration. The hearsay statements about the duration of the painting work will not be considered.

Defendants move to strike the portion of paragraph seven of Robert Foster's affidavit stating that Defendant Sarbok worked for Mijon III and High Plains, on the ground that Foster lacks personal knowledge of Sarbok's employer. Fed. R. Evid. 602. Robert Foster does not establish the necessary personal knowledge; thus this portion of paragraph seven will not be considered. However, Plaintiffs also submit an excerpt of the deposition testimony of Sarbok, in which he stated that he worked for High Plains during the relevant time period, and that Mijon III hired High Plains to oversee management of the Hotel. (Sarbok Dep. at 4-6; Pls.' Ex. C). Sarbok's deposition testimony establishes his employer.

Defendants also move to strike portions of paragraph seven of Michelle Foster's affidavit on the ground that it contains hearsay statements by C&W Drywall employees. See Fed. R. Evid. 801(c), 802. The statement, that C&W Drywall workers "used degrading, sexual profanities toward [Michelle Foster]" is not offered for the truth of the purported profanities, but merely to establish that they were uttered. This portion of the affidavit is not hearsay and will be considered.

### C. Transcript of Telephone Conversation

In addition to affidavits, Defendants move to strike the transcript of the telephone conversation in which Sarbok terminated B&D, on the ground that Robert Foster neither laid a foundation for admission of this transcript nor authenticated it. (See Transcript, Ex. 2 to RF Aff. attached as Ex. A to Pls.' Resp. to Mot. for Summ. J.) Robert Foster fulfills these requirements via a supplemental affidavit submitted as exhibit A to his response to the motion to strike. In the affidavit, Foster avers that Sarbok called him at home and identified himself as "D. Sarbok." (RF Supp Aff. at ¶ 2, Ex. A. to Pls.' Resp. to Mot. to Strike). Foster further avers that he recognized Sarbok's voice because, on several prior occasions at the Hotel, he heard Sarbok identify himself and speak. (Id.) Foster further avers that he recorded the telephone conversation with a micro cassette recorder designed to record both parties to the conversation. (Id. at ¶ 5). He avers that he operated the recorder himself, by depressing various buttons. (Id.) He adds that the tape "fully, fairly[,] and accurately reflects what [he] heard," and that the transcript "fully and accurately related the content of the original recording." (Id.) He further avers that the original tape recording has never left his physical possession. (Id.) It is in a safe in his home, and has been removed only to make copies. (Id.) Foster attaches one of these copies to the supplemental affidavit.

In their reply to the motion to strike, Defendants argue that the supplemental affidavit should not be considered because it is untimely. However, Defendants submit a reply statement of facts and additional excerpts of the depositions of both Robert and Michelle Foster with their reply. The Local Rules do not contemplate these submissions. See Local Rule 1.10(l). Defendants' supplemental affidavit will be considered. Because the affidavit lays a foundation for admission of the transcript and establishes its authenticity, the transcript also will be considered. See Fed. R. Evid. 904(a).

### D. Release and Lien Waiver Agreement

Defendants also move to strike the copy of the "Release and Lien Waiver Agreement" ("Release") attached as exhibit 3 to Robert Foster's initial affidavit, on grounds of hearsay

1  and lack of authentication. The Release is not offered for the truth of its contents; therefore,
2  it is not hearsay. See Fed. R. Evid. 801(c), 802. Robert Foster provides the necessary
3  authentication in his supplemental affidavit by explaining that the Release is a copy of the
4  one he obtained by facsimile about one month after the telephone conversation. (RF Supp.
5  Aff. at ¶ 10). The release will be considered to the extent of its relevance. The Court notes
6  that Defendants did not provide the Release to Plaintiffs at the time B&D was terminated,
7  nor do Plaintiffs offer evidence that they ever signed the Release.

8       **E.**    **Letters**

9       A letter from Sarbok to attorney Rosemary Cook regarding the Plaintiffs' claims is
10 the next item Defendants move to strike. Although the letter is attached to Robert Foster's
11 initial affidavit, it is not referenced in either the affidavit or Plaintiffs' statement of facts.
12 Plaintiffs do not rely on the letter; thus, it will not be considered.

13      Finally, Defendants move to strike a letter from Sarbok to Robert Foster, dated
14 February 26, 1997, in which Sarbok states that Foster's painting services are no longer
15 needed because he "abandoned the job and failed to perform." (Letter, Ex. 4 to RF Aff.)
16 Defendants argue that Plaintiffs have neither laid a foundation nor established authenticity.
17 In response, Plaintiffs point out that the letter is on letterhead of High Plains, the company
18 that employs Sarbok. The date of the letter is close to the date of the telephone conversation
19 terminating B&D, and references a prior discussion. Even if the transcript of that telephone
20 conversation was inadmissible, Robert Foster has an independent recollection of the
21 conversation. (RF Supp. Aff. at ¶ 8). The requirements of foundation and authentication are
22 satisfied; thus, the letter will be considered.

23 **II.**    **Motion for Summary Judgment**

24      A motion for summary judgment may be granted if the evidence shows "that there is
25 no genuine issue as to any material fact and that the moving party is entitled to judgment as
26 a matter of law." Fed. R. Civ. P. 56(c). To defeat the motion, the non-moving party must
27 show that there are genuine factual issues "that properly can be resolved only by a finder of
28

fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). The Court views the evidence in the light most favorable to the non-moving party and draws any reasonable inferences in the non-moving party's favor. Berry v. Valence Tech., Inc., 175 F.3d 699, 702 (9th Cir.), cert. denied, 528 U.S. 1019 (1999).

### A. Title VII and Arizona Civil Rights Act Claims

The provisions of Title VII protect employees but not independent contractors. Adcock v. Chrysler Corp., 166 F.3d 1290, 1292 (9th Cir.) (citing Lutcher v. Musicians Union Local 47, 633 F.2d 880, 883 (9th Cir. 1980)), cert. denied, 528 U.S. 816 (1999). Whether an individual is an employee or an independent contractor is a fact-specific inquiry designed to determine the economic realities. Id. (quoting Lutcher, 633 F.2d at 883). The primary factor is the degree to which the hiring party has the right to control the means and manner of the hired party's performance. Id. (quoting Lutcher, 633 F.2d at 883). Other factors include: (1) the kind of work, with reference to whether it is done under the direction of a supervisor; (2) the skill required to perform the particular work; (3) whether the hiring party furnishes the equipment used and the place of work; (4) the length of time during which the hired party worked; (5) the method of payment, whether by time or by the job; (6) the manner in which the work relationship is terminated; i. e., by one or both parties, with or without notice and explanation; (7) whether the work is an integral part of the business of the hiring party; (8) whether the hiring party provides the hired party benefits such as a retirement plan and annual leave; (9) whether the hiring party pays social security taxes; and (10) the intention of the parties. Lutcher, 633 F.2d at 883. Additional factors include: whether the hiring party has the ability to assign additional projects to the hired party; whether the hired party has discretion over when and how long to work; and the hired party's role in hiring and paying assistants. Loomis Cabinet Co. v. Occupational Safety & Health Review Comm'n, 20 F.3d 938, 942 (9th Cir. 1994) (citing Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 323-24 (1992)).

Considered in totality, the factors clearly establish that Plaintiffs were working for Mijon as independent contractors. Mijon was in the business of operating the Hotel, not painting. The work of painting was not an integral part of its business; rather, Mijon hired painters as part of a renovation and remodeling project. (Aff. of Kenneth McIntyre, independent contractor working for Mijon during the relevant time period, at ¶ 4, Defs. ex. A). While painting, the Fosters and their employees did not provide Mijon with any assistance in running the Hotel. (Michelle Foster ("MF") Dep. at 338, Pls.' Ex. F). Any work the Fosters or their employees did other than painting was preparatory work such as caulking or removing light fixtures.

Mijon hired B&D, a commercial and residential painting business, not the Fosters or their assistants individually, to paint the Hotel. Mijon issued checks only to B&D. (Robert Foster ("RF") Dep. at 228, Defs.' Ex. C; Checks Issued by Mijon to B&D, Defs.' Ex. I). Mijon provided B&D an IRS form 1099, used to report miscellaneous income. (1099 Forms, Defs.' Ex. B). Mijon's payments to B&D appear under the 1099 category of "nonemployee compensation." (Id.) Mijon withheld no payroll taxes, such as social security, from the money paid to B&D. (Id.; RF Dep. at 227; MF Dep. at 135, 457, Defs.' Ex. D). Consistent with the 1099 forms, the Fosters listed no income from wages or salaries on either their 1996 or 1997 joint tax returns. (Tax Returns, Defs.' Exs. M-N). They listed only business income from B&D, and they paid self-employment taxes. (Id.)

B&D is a business entity completely separate from Mijon. (RF Dep. at 43). Robert Foster has owned B&D, a sole proprietorship, since 1987. (RF Dep. at 43, 54; MF Dep. at 20-21). During the relevant time period, B&D was licensed as a contractor by the Arizona State Registrar of Contractors. (MF Dep. at 25; License Renewal Form, Defs.' Ex. E). Mijon did not pay B&D's license fees during the relevant time; rather, B&D paid these fees itself. (Payment attached to License Renewal Form, Defs.' Ex. E). B&D also maintained commercial liability insurance during the relevant time period. (MF Dep. at 38-39; Liability Insurance Renewal Certif., Defs.' Ex. K). Mijon did not pay for this insurance.

At different points during the six-month period that the Fosters painted a portion of the Hotel, B&D employed at least nine other people to assist with the painting. (See Weekly Time Cards, reflecting work at Twin Palms by: Gehrman, Smith, Jones, Wolfcale, Bell, McKenzie, Miner, Clark, and Martin). Robert Foster had complete control over hiring and firing these painters, and functioned as their supervisor at the work site. (RF Dep. at 166, 182-83, 190, 196, 231-32; MF Dep. at 458). Mijon did not exercise any control over who B&D hired to help with the painting, or who B&D fired. (RF Dep. at 227, 23). Likewise, Mijon did not pay any of the assistant painters' wages. Rather, B&D paid their employees weekly with checks drawn on B&D's account. (MF Dep. at 105, 236, 325-26, 457; B&D Payroll Checks, Defs.' Ex. G). Michelle Foster calculated the amount to withhold from these checks for payroll taxes, including federal and state income taxes and social security. (MF Dep. at 106). B&D provided year-end wage and tax statements to these employees on IRS form W-2. (MF Dep. at 368, 381; W-2 Forms for 1996 & 1997, Defs.' Ex. H). B&D also maintained worker's compensation insurance for its employees during the relevant time period. (MF Dep. at 39; Worker's Compensation Ins. Policy, Defs.' Ex. J).

In addition to supplying its own workers, B&D supplied equipment and materials it either rented or purchased to apply the paint. These materials included brushes, rollers, paint sprayers, and "swing staging" that B&D rented from Action Equipment and Scaffolding Company. (RF Dep. at 204-205; Action Equipment Rental Agreement, Defs.' Ex. L). The only material the Hotel provided was the paint — a wall-coating named "Tex-Cote" — and a tool to assist with removal of fixtures. (MF Dep. at 62-64, 205-206, 455-56).

B&D maintained a separate business identity throughout the relevant time period. Although the Fosters and their employees painted at the Hotel site, as required by the nature of the work, B&D's office was at a separate location. (MF Dep. at 60). Mijon did not provide B&D with an office at the site. (MF Dep. at 62, 458). Michelle Foster did the bookkeeping for B&D, including payroll of the assistant painters. (RF Dep. at 57; MF Dep. at 105-106). Mijon did not participate in this bookkeeping. Similarly, Mijon had no input

into or control over B&D's yellow pages advertising or its business cards. (RF Dep. at 206-209; MF Dep. at 89-90). The business cards contained the name of Robert Foster and B&D, not of Mijon, the Twin Palms Hotel, High Plains, or Sarbok. (RF Dep. at 232-33).

Mijon placed no restrictions on B&D's ability to take other painting jobs during hours outside the hours the Fosters and their employees were painting at the Hotel. (MF Dep. at 143). Robert Foster and at least one other employee painted a condominium over a weekend during the relevant period. (RF Dep. at 199; McKenzie time card, Defs.' Ex. F at bates stamp F00250). Time cards show other B&D employees also painted at sites other than the Hotel during the relevant period. (Time card, Defs.' Ex. F).

In arguing that they were employees, the Fosters largely rely on evidence that Kerry Barber, the Maintenance Engineer for the Hotel, "closely supervised" their work. MF Aff. at ¶ 2; Pls.' Ex. B, RF Aff. at ¶ 2; Pls.' Ex. A). Michelle Foster avers:

> During the time we worked at the Twin Palms Hotel, my husband and I and other B&D Painting workers were all closely supervised and instructed as to the manner in which we did our work. We were closely supervised and instructed by Kerry Barber. Kerry supervised and instructed us on a daily basis on all aspects of our work at the hotel. I described a number of specific ways in which Kerry supervised and instructed us in my deposition.

(MF Aff. at ¶ 2). Robert Foster's affidavit contains an almost identical statement. (RF Aff. at ¶ 2). In addition, Kerry Barber avers that he checked the B&D painters' work every day, usually several times a day, and required corrections when necessary. (Barber Aff. at ¶ 4, Pls.' Ex. E).

Michelle Foster's deposition testimony provides far more detail about Barber's purported supervision. First, her testimony indicates that Barber provided the B&D painters with instructions about how to perform certain preliminary tasks. Prior to painting, the Fosters asked Barber how he wanted them to remove the wallpaper and the glue underneath it. (MF Dep. at 192, 194, 196, Pls.' Ex. F). Barber demonstrated by pulling the wallpaper off in sheets, and instructed them to remove the glue by spraying a glue remover on the wall and then wiping it off. (Id. at 195, 197). When Barber saw the Fosters and their employees using sponges to wipe off the glue, he "came up with the idea" of removing the glue by using

trowels to scrape the wall. (Id. at 198, 203-204). He also instructed them about how to remove the fixtures before painting, including instructions on the specific tools to use. (Id. at 201, 205).

Barber also regularly checked the B&D painters' work and instructed them about how to correct it when necessary. He instructed them to put plastic on the floors because something was leaking into the rooms below and creating a mess. (Id. at 207). Thereafter, he checked the plastic to make sure nothing was leaking. (Id. at 208). Barber checked their caulking work and instructed them to redo portions of it. (Id. at 214-217). He also checked several aspects of the painting work. Specifically, Barber checked on whether the "cut-in" paint, i.e. the paint applied by brush to the edges of the walls, matched the paint applied by roller on the remainder of the wall. (Id. at 217). He also checked on how thick the paint was being applied, for consistency. (Id.) He checked that the paint lines at the edges, where the wall met the ceiling, were straight and he required the B&D painters to correct any that were not. (Id. at 218-19). He even directed the mixing of paint batches. (Id. at 213).

Robert Foster provides few specific examples of Barber's supervision. Mr. Foster testified by deposition that Barber was often in the area where they were working the entire day, but adds that Barber did work of his own as well as supervising their work. (RF Dep. at 145, Pls.'s Ex. G).

Plaintiffs also point to other factors that, they argue, further support the conclusion that they were employees. They were required to work specific hours, 6:00 a.m. to 2:30 p.m., and B&D was paid based on the number of hours the Fosters and any of their employees worked, rather than being paid by the job. (MF Dep. 141; MF and RF Affs. at ¶ 4). Finally, B&D was terminated without notice.

The evidence, considered as a whole, does not provide a basis for a reasonable fact finder to conclude that Plaintiffs were employees rather than independent contractors. See Anderson, 477 U.S. at 250 (stating the non-moving party must show that there are genuine factual issues that may reasonably be resolved in favor of either party). Although Barber

provided a significant amount of direction and oversight, his role was largely one of quality control. The Fosters, acting as B&D, remained responsible for selecting painters and providing the necessary painting equipment. B&D functioned as a separate business with its own license, employees, insurance, office, and advertising. Mijon did not transform the Fosters and their employees into employees of Mijon by monitoring the quality of their work. Therefore, the Court will grant Defendants' motion for summary judgment on the Title VII claim against Mijon as well as the other Defendants, who Plaintiff claims were acting as Mijon's agents.

Arizona courts construing the Arizona Civil Rights Act ("ACRA"), A.R.S. § 41-1463, apply the same test used by the Ninth Circuit to determine whether a claimant is an employee or an independent contractor under Title VII. See St. Luke's Health System v. Arizona Dept. of Law, Civil Rights Div., 884 P.2d 259, 263 (Ariz. Ct. App. 1994). Because Defendants are entitled to summary judgment on their Title VII claim, their motion for summary judgment on the ACRA claim will be granted as well.

### B. Intentional Infliction of Emotional Distress

Defendants request summary judgment on Plaintiff's claim of intentional infliction of emotional distress. This tort claim requires proof of the following elements: (1) the defendants' conduct must be "extreme" and "outrageous"; (2) the defendants must intend to cause emotional distress or recklessly disregard the near certainly that such distress will result from their conduct; and (3) severe emotional distress must occur as a result. Mintz v. Bell Atlantic Systems Leasing Int'l, Inc., 905 P.2d 559, 562-63 (Ariz. Ct. App.) (quoting Ford v. Revlon, 734 P.2d 580, 585 (Ariz. 1987)), rev. denied (Ariz. 1995)). The conduct must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Ford, 734 P.2d at 585 (quoting Restatement (Second) of Torts § 46, cmt. d).

A corporation is liable for intentional infliction of emotional distress when it ignores an employee's repeated reports of severe sexual harassment encompassing both a physical

assault and vulgar threats of sexual assault. Ford, 734 P.2d at 585. In Ford, Revlon knew about the physical assault and the repeated vulgar remarks — it also knew that the plaintiff felt threatened as a result and was emotionally distraught. Id

In contrast, the plaintiff in Mintz failed to state a claim of intentional infliction of emotional distress. After Bell Atlantic failed to promote Mintz a second time on grounds she believed to be discriminatory, Mintz was hospitalized with severe emotional and psychiatric problems and began receiving short term disability benefits. 905 P.2d at 561. Approximately three months later, the company terminated her disability benefits and ordered her to return to work. Id. She did so, but was rehospitalized the following day. Id. One day later, Bell Atlantic delivered a letter to Mintz in the hospital informing her that her job duties were being reassigned. Id. In concluding that these allegations did not state an intentional infliction of emotional distress claim, the court noted that Bell Atlantic had a legitimate business purpose in replacing Mintz. The court added: "It is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for . . . intentional infliction of emotional distress." Id. at 563.

Plaintiffs argue that a reasonable jury could find the Defendants liable for intentional infliction of emotional distress based on the following facts. About six weeks before Sarbok terminated B&D, Michelle Foster filed a complaint that the employees of C&W Drywall, who were also working at the Hotel, had sexually harassed her. (MF Aff. at ¶ 7). She claimed that one of the workers exposed himself to her and others directed "degrading, sexual profanities" toward her. (Id.) During the telephone conversation in which he terminated B&D, Sarbok acknowledged that Robert Foster and someone from C&W Drywall had informed Ken McIntyre, the independent contractor who eventually became the general contractor, that they were going to settle everything. (Tr. at 1). However, Sarbok expressed displeasure with the fact that the matter had not yet been resolved. (See id.) He stated that he had tried to resolve the matter four weeks earlier, and "it need[ed] to be resolved . . . [and] over with." (Id.)

   Sarbok considered the appropriate resolution to be terminating B&D's contract. He instructed Robert Foster to bring over the paint that had been purchased and sign a release. (Id. at 1-2). In return, Sarbok stated that he would pay Foster that day and they would never have to do business again. (Id. at 2, 3,4). Sarbok stated that he was not unhappy with their work, and they had done a "nice job." (Id. at 2,3). However, he added, "I'm unhappy with some of the other things that are happening absolutely." Id. at 2. He offered only the following additional rationale: "I'm saying to you[,] hey[,] if you are unhappy[,] which you are now. I am not happy[.] [W]hy don't we break if off nicely[?] (Id. at 3). At the end of the conversation, Sarbok repeated his instruction to come to the Hotel with the paint, "[a]nd then I will give you your check and we'll basically sever our relationship." (Id. at 4).

   Thereafter, Sarbok sent a letter to Robert Foster, dated February 26, stating that his services were no longer needed, "effective as of Monday when [they] discussed this issue." (Letter, Ex. 4 to RF Aff.) Sarbok added, "You abandoned the job and failed to perform at the Twin Palms Hotel . . . ." (Id.) The Fosters obtained a copy of a release by facsimile approximately one month later. (RF Supp. Aff at ¶ 10; Release, Ex. 3 to RF Aff.) However, there is no evidence that the Fosters signed the release or that they were not paid for their work up to the time of B&D's termination.

   Although Defendants' acts appear unwarranted and even unfair, they are not so outrageous as to be beyond all possible bounds of decency. Ford, 734 P.2d at 585. Defendants did not sexually harass Michelle Foster. They terminated B&D's painting contract because of Michelle Foster's complaint of sexual harassment by employees of another company at the work site. In addition, Sarbok threatened to require a release before giving Plaintiffs the payment they were already owed. However, the evidence does not indicate that Defendants followed through with this threat. Sarbok's statement, in the letter, that Robert Foster abandoned the project and failed to perform appears to be false, as well as inconsistent with prior statements that B&D did a "nice job," but the statement is not so insulting as to be outrageous. Unlike the situation in Ford, none of Defendants' conduct

posed a direct or indirect threat to Plaintiffs' physical safety. Plaintiffs have not created a genuine issue of fact on their claim of intentional infliction of emotional distress; therefore, the Court will grant Defendants' motion for summary judgment on this claim.

### C. Tortious Interference with Contract Claim; Arizona Employment Protection Act Claim

As Defendants note in their reply, Plaintiffs' response to the motion for summary judgment does not offer any arguments or evidence in support of the tortious interference with contract claim or the Arizona Employment Protection Act ("AEPA") claim. With respect to the former, Plaintiffs allege in their Complaint that B&D and they "had an employment contract with Ken McIntyre, the general contractor for Twin Palms Hotel, to perform painting and related tasks at the . . . Hotel," and that Defendants instructed McIntyre to terminate the contract. (Compl. at ¶ XXXII, XXXIII). By affidavit, McIntyre avers that he did not have a contract with Plaintiffs or B&D. (McIntyre Aff. at ¶ 22). McIntyre did not begin his contracting work at the Hotel until October 1996, two months after Plaintiffs started painting in August, 1996, and did not become general contractor until late in 1997, after B&D's contract with Mijon had been terminated. (Id. at ¶¶ 4, 9).

A tortious interference claim arises only when a third party improperly interferes with a contract. Mintz, 905 P.2d at 564 (quoting Wagenseller v. Scottsdale Mem. Hosp., 710 P.2d 1025, 1042 (Ariz. 1985)). Defendants were not third parties because B&D's contract was with Mijon. Neither Mijon nor the other Defendants, acting as Mijon's agents, could tortiously interfere with a contract to which Mijon was a party. See id. at 564-65. Defendants are entitled to summary judgment on the tortious interference claim.

The AEPA allows an employee to file a wrongful discharge claim "if [his or her] employer has terminated the employment relationship . . . in violation of a statute of this state." A.R.S. § 23-1501(3)(b). However, the Act proceeds:

> If the statute provides a remedy to an employee for a violation of the statute, the remedies provided . . . are the exclusive remedies for the violation of the statute or the public policy set forth in or arising out of the statute, including the following: . . . [t]he [ACRA].

A.R.S. § 23-1501(3)(b)(i). Because Plaintiffs are not employees, the AEPA is arguably inapplicable to them. Even if it is applicable, however, Plaintiffs argue that they were terminated in violation of the ACRA. Under the AEPA, the ACRA provides the exclusive remedy for terminations in violation of that statute. No separate claim exists under the AEPA; thus, Defendants are entitled to summary judgment on the AEPA claim.

### D. Conclusion

Defendants are entitled to summary judgment on all claims; therefore, their motion will be granted in entirety. In the conclusion to their motion, Defendants request attorneys' fees. However, in the discussion of attorneys' fees in the preceding paragraph of their motion, Defendants merely "respectfully request the opportunity to fully brief the issue of their entitlement to attorneys' fees after the resolution of this [summary judgment] Motion." (Defs.' Mot. at 16). Defendants may file a separate motion requesting attorneys' fees and setting forth the arguments and evidence in support of that request. Plaintiffs may file a response and Defendants a reply in accordance with the Local Rules.

Accordingly,

**IT IS ORDERED** granting Defendants' motion for summary judgment. (Dkt # 80).

**IT IS FURTHER ORDERED** treating Defendants' motion to strike Plaintiffs' evidence submitted in opposition to summary judgment as a motion to exclude the evidence from consideration, and granting the motion to the extent explained above. (Dkt. # 90).

**IT IS FURTHER ORDERED** that Defendants may file a separate motion requesting attorneys' fees no later than Friday, March 23, 2001, and setting forth the arguments and evidence in support of that request. Plaintiffs may file a response and Defendants a reply in accordance with the Local Rules.

DATED this 5th day of February, 2001.

Earl H. Carroll
United States District Judge